We will hear argument first this morning in Case 21-454, Sackett v. EPA. Mr. Schiff, you're up first this year. Thank you, Mr. Chief Justice, and may it please the Court. It's now going on 16 years since Petitioners Mike and Chantel Sackett began construction of a house on a vacant lot in a largely built-out subdivision. Yet their home-building plans remain on hold to this day because EPA remains steadfast in its view that their property contains navigable waters subject to regulation under the Clean Water Act. But under no plausible interpretation of that term does the agency have such authority. Now, the statute defines navigable waters as the waters of the United States, and so explicitly requires that EPA establish two things before it may regulate. First, there must be a water, that is, a hydrogeographic feature that in ordinary parlance would be referred to as a type of stream, creek, river, lake, or the like. A wetland, however, is none of those things, and so it can be regulated as a water only to the extent that it blends into and thus becomes indistinguishable from an abutting water. Second, the water has to be of the United States, that is, for all practical purposes, a navigable, in fact, water. Now, this test is vastly superior to the significant nexus test for a number of reasons. First, and most importantly, the two-step framework closely adheres to the textual limits that Congress itself imposed on the agency. Second, by faithfully adhering to those limits, the test faithfully vindicates all of Congress's purposes, not just its water quality purposes, but also its desire to preserve the state's traditional preeminence over land and water resources. And thirdly, it's an easy-to-administer test. Ordinary citizens can use their own eyes to reliably determine whether or not their land is regulated. And under this two-step framework, it's clear that the SACWIS property contains no waters, much less waters of the United States, and so they should be entitled to a declaration that their property is not subject to EPA's authority. Mr. Schiff, can intrastate, purely intrastate navigable bodies of water be waters of the United States? Yes, Justice Thomas. And how is that, if it's purely intrastate? As a statutory matter, if that intrastate navigable water connects with some form of intrastate transportation, such that there could be a continuous channel of intrastate commerce, then that water could be regulated. So what does that mean? I'll give you an example, Your Honor. The Great Salt Lake. The Great Salt Lake is not a traditional navigable water, even though it's navigable in fact, precisely because it doesn't hook up to any other waters to flow intrastate. But obviously there are a lot of forms of non-aquatic transportation that can get you there, and that can sustain an intrastate channel of commerce. So that's an example of a water body that, though wholly intrastate, would qualify as a statutory matter as a water of the United States. So why isn't that met here? Well, Your Honor, there is no allegation whatsoever that the SACWIS discharged any pollutants into Great Salt Lake. Well, I think the question or the issue would be if there is nearby a body of water that could be considered navigable, that possibly the wetland could be associated or connected with that in some way. Your Honor, the — I mean, don't you have a ditch? You have a body of water, and you have sort of a nexus with the land. Justice Thomas, mere adjacency itself cannot justify the agency's statutory jurisdiction for a number of reasons. The text of the statute says — certainly it's not even of the United States — the text says that if it's not even a water, it can't even be regulated. And the plain meaning of water, as elucidated by dictionary definitions and what have you, is streams, creeks, rivers, what have you, not wetlands. But doesn't that, Mr. Schiff, ignore the import of 1344G1, which really specifically says that when we're talking about waters, we're talking about including their wetlands, 1344G1 says. So if we're going to be fair to the text of the statute, isn't there a pretty powerful indication that wetlands are included, adjacent wetlands are included? And then we can talk about what the word adjacent means, but adjacent wetlands are included. Absolutely, Justice Kagan. There's no doubt that some wetlands are, in fact, regulated, and the question is, what kind of wetlands? Now, adjacency in the context of 404G clearly means physically touching. For example, if I were to say, I own two adjacent parcels of land. Well, you say that's clearly true, but in fact, when you look to our normal indicators of statutory meaning, at first we look to dictionaries. If you look to dictionaries, both legal and non-legal, what they show is that adjacency actually is not the same as touching or contiguity, that adjacency has something to do with proximity, of course. But the definitions are actually remarkably explicit about the fact that two things can be adjacent to each other without touching each other. Justice Kagan, if I could respectfully disagree, certainly adjacency in the abstract can have more than one meaning, but in the particular context of comparing relationships between topographic features, as that word is obviously employed in 404G1, I think the only plausible understanding of that term is physically touching. I'm not sure that's right. I don't know whether they're topographical features or not, but you would readily say that a train station is adjacent to the tracks, even though it's not touching the tracks. That is right, Mr. Chief Justice. That is correct. However, the example that I was going to give is, if I were to say that I own two adjacent parcels of land, I don't think anyone would just simply think that I meant I own two parcels of land in the neighborhood, but that necessarily implies that they're physically touching, and it's that particular... Well, let me give you another example. I grew up in an apartment building in New York City. If I say there are two adjacent apartment buildings, do they have to be touching each other, or could be, you know, one is across a side street, you know? I mean, I would say that those, you know, those two apartment buildings are adjacent to each other because there's no other apartment building in between them, even if they're not touching each other. Again, Justice Kagan, I would say that when we're speaking specifically about physical topographic features, natural features like wetlands and other water bodies, I think that physically touching requirement is essential and is the meaning of adjacency as used in 404G. That is, in fact, actually... Mr. Schiff, isn't the issue what Congress would have intended with respect to adjacency, and there was a regulation that defined adjacency to include neighboring? And as far as I know, Congress used the term adjacency and didn't adjust it to try to make clear the touching requirement that you say was intended by the term. Yes, Justice Jackson. Every single time that argument has been advanced by the government, it has been rejected by this court. In Rapanos, the plurality opinion rejected out hand the idea that 404G represents a ratification of the court's broad understanding of adjacency. Justice Kennedy's opinion doesn't even give it consideration. Swank, for its part, said 404G is unenlightening as to the meaning of waters in the island. Let me try to bring some enlightenment to it by asking it this way. You say the question is which wetlands are covered, which I agree with, but I guess my question is why would Congress draw the coverage line between abutting wetlands and neighboring wetlands when the objective of the statute is to ensure the chemical, physical, and biological integrity of the nation's waters? So, are you saying that neighboring wetlands can't impact the quality of navigable waters? Justice Jackson, not at all. However, it's also important to acknowledge that Congress was balancing concerns here. On the one hand, there is a water quality issue. But on the other hand, there's a very important federalism issue. It's so important that actually Congress put it in the text of the Act, that one of the purposes of the Act is to preserve traditional state authority over land and water resources. I didn't read that as a purpose. I mean, Congress said our objective is to address or make sure that we maintain the integrity of the waters. It was one of the policies in achieving that objective that we care about states' rights or federalism concerns. But I didn't see that as Congress's primary objective or even a main objective with respect to the Clean Water Act. That is true, Justice Jackson, although this court in Swank very much relied upon what we like to call this principle of federalism to adopt a narrow construction. Your counsel, how can you say they wanted a narrow construction when they were very, very clear in the statute in 1341G that the corpse couldn't give states' jurisdiction over adjacent wetlands to navigable waters? You are not disputing that Priest Lake is a navigable water, correct? That is correct, Your Honor. It's 62 miles long. It carries people. It's an instrument in transport. That's the definition of traditional navigable waters. So as I see the question here is what did Congress mean by adjacent? And now we're going, you are saying it requires a continuous water surface. But how about a natural being? Even the Trump administration, who came close to adopting your meaning, exempted beams. It exempted beaver dams. It exempted those two items, and they would stop continuous surface flow. So where does your definition come from? Justice Sotomayor, if I could go back first to the first point about 404G, and also in partial response to Justice Jackson's question, even in Riverside Bayview, which is the only time that this court has actually upheld the agency's assertion of jurisdiction, even there at most the court was willing to say is that 404G simply means that wetlands are not necessarily excluded from the definition of waters. But it wasn't even prepared to adopt a general affirmation of adjacency. In part that's because none of the 1977 amendments had anything to do with a definitional text. And I think this is in response to your second question, Justice Sotomayor. Where does the text come from? Well, it comes from that unchanged definitional text. Congress did not change the term the waters of the United States. And a water is, again, in ordinary parlance, we would submit something that is other than a wetland. And the only way that one can plausibly regulate it is if one has, what was it issued in Riverside Bayview? I'm sorry. EPA had, by that time, as Justice Jackson said, indicated that the term adjacent wetland would include wetlands separated by berms or dunes or man-made dikes or levees from the navigable water. So EPA, as of 1977, had made that clear. And the term adjacent wetland explicitly made that clear. And then Congress uses the term adjacent wetland. And my understanding is every administration since 1977, but correct me if I'm wrong, has stuck with adjacent wetland includes those wetlands separated by berms, dunes, dikes, or levees from the navigable water. So why shouldn't we read adjacent wetland in the statute to mean what EPA had said, as Justice Jackson asked? And what significance should it have that every administration since then has included those wetlands as covered by this statute? Justice Kavanaugh, in answer to your first question, I think, again, it goes back to the text, that if one accepts the proposition that waters, their ordinary meaning, as employed by Congress, does not normally include wetlands, then that raises a textual difficulty. But in Riverside Bayview, you said the contrary to that, obviously. It said wetlands are included. The statute refers to adjacent wetlands. EPA has said since 1977 that adjacent means those wetlands, even if separated by berms, dunes, levees, or dikes. Well, Justice Kavanaugh, I don't want to necessarily die on this hill because, obviously, the facts in this record are such that... Let's put aside the facts of this case because this case is going to be important for wetlands throughout the country, and we have to get it right. So why wouldn't a wetland separated by a berm, dune, levee, or dike be covered contrary to what, in the last 45 years, have suggested? In response to the second part of your question, Justice Kavanaugh, about the fact that the agencies have consistently interpreted this over a long period of time, I think Justice Scalia appropriately responded to that argument in the Rapando's Plurality, where he says it's a sort of now 40-year adverse possession of statutory authority. So I would say the mere fact that it's been interpreted that way can't convert the fact that if one accepts that waters, as ordinarily understood, and not just in the dictionary, but in our yellow brief... Well, I would agree with that, but for the initial history of when Congress put that term, adjacent wetland, or I would think that has some force, at least, but for that... Can I ask just a clarifying question to Justice Kavanaugh? If you could help me with the timing, because as Justice Kavanaugh says, one argument that the government makes, and that would have some force, is that the regulation defined adjacent in the way Justice Kavanaugh is pointing out. What is the timing? Because I understand that that regulation was adopted in 1977, and 1344G was passed in 1977? Yes, Justice Barrett, my understanding, and it was actually regulation from the Army Corps, not from the EPA. But the Army Corps had a series of regulations, and the final version was issued in 1977, I think shortly before. So it wasn't like an old soil. It was pretty proximate in time to the enactment of 1344G? I believe, Justice Barrett, it was about one or two months prior to the enactment of the 1977 amendments. The Act was December, and this was, I think, in the summer. But wasn't this discussed? The whole question of wetlands was a big part of the discussion in the 1977 amendments? Or am I wrong about that? No, you're absolutely right, Justice Kavanaugh. And, again, the Sacketts certainly don't dispute that wetlands are, in fact, regulated. But, again, I would go back to Justice Scalia's analysis in the plurality opinion. One cannot read the legislative history of the 1977 amendments to then conclude that every jot and tittle of the Corps' regulations were then affirmed. And, in fact, again, I would go back to Riverside Bay. Even lengthier history, I mean, before the regulations become the regulations, there's a whole controversy about it because the first Corps regulation was much more along the lines of what you were proposing. And then there was a big brouhaha, and the Corps was interpreting it too narrowly, and the Corps essentially changed its mind. And everybody was aware that this had happened, that the Corps first came out of the blocks with a narrow interpretation and, you know, was essentially convinced to reverse itself on the theory that it was not reflective of what Congress had wanted. Justice Kagan, I would say one answer is that if Your Honor is referring to, say, a failed legislative proposal, I mean, I don't think one can really put much— I'm not really referring to that. I'm sort of referring to a story that I don't think anybody disputes about the history here, which is that the first regulation, the first interpretation is quite narrow, and there was a blowback, and the Corps changes its mind. And so everybody's aware on a sort of continuing basis of this issue. It's not as though, you know, the regulation came out, and then the statute was amended all within a month, and nobody had time to think about this question. I mean, people had been thinking about this question almost the entire time in the interim between the initial statute and the amendment. That is true, Justice Kagan, but I think there's a lack of commensurability here in that the relevant Corps regulation during this period that you note was a regulation purporting to interpret the waters of the United States. Now, it would seem passing strange, in my view, for Congress to say, we're going to resolve this lengthy administrative dispute by entirely ignoring the statutory text that the regulation that has caused the dispute is related to, and instead we're going to affect what amounts to a significant expansion of federal authority over land use by including in a parenthetical and a provision that deals with permit transfer a reference to adjacent wetlands. That seems to me just to be an unlikely way for Congress to affect what would be a significant unbalancing of traditional... When counsel enshrank, we said directly, the 1977th Amendment showed, quote, Congress unequivocal acquiescence to and approval of the Corps regulations interpreting the Act to cover wetlands adjacent to navigable waters. There we faced the question and said, at least as to that definition, Congress was clear. So, my problem with your point is, even Raponos, Justice Scalia, recognized whether it's scientifically accurate or not, that what navigable waters can be is anything that's adjacent to what we think of as traditional navigable waters. No one's suggesting you can put a boat on a wetland. It would sink. You can't put a boat of certain sizes or many near the shoreline because they would sink. There's not enough water there to hold them up. So, I don't understand how the wetland has to be navigable. It does have to be adjacent because it's part of that river. And Raponos suggested it's hard to tell where the beginning of the wetland is and where the beginning of the water is, whether that's true or not is irrelevant. Congress defined the term as navigable waters and adjacent wetlands. So, if I take that as their definition, why don't we say that something that is near qualifies? And so, the question becomes what's near enough, isn't it? Justice Sotomayor, I would respectfully disagree. I think this would be a totally different case if Congress, in fact, had defined navigable waters as the waters of the United States plus adjacent wetlands, which is precisely what the core regulation was trying to do in the 70s. But Congress hasn't done that. In fact, it studiously avoided touching that central definitional provision for the last 50 years. With respect, though, Justice Sotomayor, to your point about why do wetlands have to be navigable, they don't have to be navigable. Certainly, in the normal delimitation of any water, you're always going to have a point at which navigability, in fact, towards the banks of a river, for example, is going to disappear. But that doesn't change the fact that one can plausibly define a river, say up to its ordinary high water mark, and understand that waterward of that mark, one might not have navigability at all points. And I think the same thing is true when it comes to defining the outer scope of waters with respect to abutting wetlands, that as one approaches the shore, it may not become physically possible to navigate, but one can still reasonably say that one hasn't yet completely departed the water. But, counsel, why is it that your conception of this does not relate in any way to Congress's primary objective? Do you dispute that the primary objective, as stated in the statute, I guess it's at 1251, is that Congress cared about making sure that the chemical, physical, and biological integrity of the nation's waters was protected? Justice Jackson, we don't dispute that. However, no statute pursues its purpose or its objective at all costs, that the limitations in the statute are as much a part of its purpose as its affirmative authorization. So why didn't Congress say immediately adjacent? If they were trying to achieve something different than what the regulations had said about adjacency, if they were balancing their concerns about protecting the integrity of the navigable waters with the property interests and the state's rights to control it, why didn't they say immediately adjacent in terms of the wetlands coverage? Why didn't they use the word they used elsewhere, abutting? Well, Justice Jackson, I don't believe the term abutting appears in the statute. Oh, it actually does. Assume it does. There are other sections that use the word abutting. Well, Justice Sotomayor and Justice Jackson, I would say with respect to the question of immediate adjacency, I think one reason why Congress didn't bother is because I don't believe Congress was at all thinking that 404G would have any impact upon the scope of the Act. Again, if Congress intended to want to definitively change the scope of the Act, one would think that the most natural move would have been to amend the definition of navigable waters. But can I just, I'm sorry, you suggest that the balancing, that the limitation is about the concerns with respect to the state's administration and 1344G is precisely where they're talking about what is left to the state versus the federal government. And in that statute, it just uses adjacent. So with respect, that seems to me to be exactly where they would have made clear that the federal government's scope of authority was abutting or immediately adjacent and were leaving the rest to the states under your own theory of what they were trying to do. Justice Jackson, my disagreement there is that that presupposes that Section 404 already regulates the universe of all wetlands and that it's essentially a federal privilege whether or not any of that regulatory authority will be given back to the states. But I don't believe that that's at all what Congress intended. I think Congress recognized that setting aside the Clean Water Act, there would be a significant swath of land use and water regulation that would remain to the states. And I think one good example to prove that point is, as we discussed in the briefs, non-point source pollution. Everyone recognizes that non-point source pollution is a serious water quality issue. But it's never been disputed that the Clean Water Act doesn't reach that, which I think emphasizes that the purpose of Congress in enacting the Clean Water Act was not at all costs, let's clean up water quality as much as we can. It was a balancing to recognize that some water quality measures like wetlands regulation, inevitably, as this case demonstrates, inevitably converts EPA and the Corps into land use administrators. Can I just ask you, so the reason why, in your view, Congress includes wetlands or thinks some wetlands should be in there is what? Is it because they can't be distinguished or because those wetlands affect the water quality of navigable waters? Justice Jackson, I think the main answer is that precisely the rationale that Riverside Bayview gave. That inevitably, in delimiting any true waters, one will have to pick a point at which land ends and water begins. And in that intermediate zone, there will be things like wetlands. But if you read Riverside Bayview carefully, it looks to me as though we were talking about the Corps' rationale, not Congress'. That we were saying the difficulty of being able to tell land from water is the reason that the Corps thought it should or could include the abutting wetlands. But it doesn't suggest that that was Congress' reason, that Congress said something about wetlands because it would be too difficult to distinguish. So is there something in the text or the history of the statute that points to that concern as being one of Congress? Yes, Justice Jackson, I would go back again to the definitional text that Congress used the term waters. Congress knew about wetlands. Congress knew about how wetlands affect water quality, even in 1972. In our yellow brief at pages 4 and 5, we cite a number of examples in the years leading up to 1972 where Congress in a variety of acts explicitly distinguished between wetlands and other types of waters. So Riverside Bayview certainly adopts, in our view, the idea that waters are ambiguous when applied to the facts on the ground. And that ambiguity necessarily means that some wetlands will be regulated. And to justify that perhaps mild excursion from the text, Riverside Bayview noted the Corps' ecological judgments. That those judgments supported the categorical rule that where the line-drawing problem arises, that is when Congress can regulate these wetlands as waters. Mr. Schiff, let me follow up on Justice Jackson's question. 1344G is the biggest problem for you, clearly. Is your answer to Justice Jackson, she's pointing out that in the parenthetical in 1344G where it gives the state, well, 1344G gives the state permitting authority but accepts navigable waters, essentially, including wetlands adjacent thereto. If we read waters of the United States as you propose, does that mean that wetlands fall in another world where neither states nor the federal government can regulate them? No, not at all, Justice Barrett. I mean, certainly there will be many wetlands that will still be regulated even if the court adopts the test the SACs have offered precisely because of this line-drawing problem. That there will be wetlands that cannot be readily distinguished from adjoining waters. But you're assuming you're definitely, oh, sorry. Go ahead. You're assuming the adjacent, you're assuming that we adopt your, I'll save it for my rounds, it's fine. Counsel, thank you. We've been talking a lot about adjacency, but your test also addresses the question of continuity. Are you saying in your brief that there is no wetland if, for example, in a few weeks in July, you know, the ground dries up and there isn't an immediate connection between wet area and the navigable water? No, Mr. Chief Justice. I mean, we make allowance for this normal circumstances understanding that what should guide the line-drawing standard application is what would in normal circumstances be the case. Well, is it normal circumstances if it's from the fall to the spring, but June, July, and August, you don't have that kind of connection? If on a normal yearly basis there would not be a continuous connection, then I think it would be very hard to fit the wetland into the rationale of the line-drawing problem standard. And not simply in the area that's dried up, but you would say the entire area that is normally connected but isn't for three months in the summer, that whole area is not a wetland? No, Mr. Chief Justice, if I understand the hypothetical correctly, it's not that it suddenly defederalizes everything, but certainly it's difficult to understand textually how one can regulate an area as a water if on a regular basis there is no water there. Does the summer count as a regular basis? It just dries up in the summer. It's pretty common, I think, for wetlands, or at least adjacent waters in many situations. Mr. Chief Justice, it's certainly a regular occurrence. And admittedly, this is one of the cases at the margin where I would say with respect to any legal rule there's going to be difficult cases. And perhaps that could be reduced through further agency rulemaking. But I think what's important, and what we haven't really discussed, which the Court hasn't noted much yet, is comparing whatever shortcomings there may be in the line-drawing problems test to the shortcomings that are orders of magnitude greater from the only other game in town, the significant nexus test, both in terms of its lack of fidelity to the text, in terms of its subversion of the federal structure, in terms of its much greater difficulty in application. Thank you, Counsel. Justice Thomas? Counsel, I'd like to just give you a minute to at least comment on what we have said about 1344G in Swank and what the Court has said about it in Riverside. Because as I recall, we suggested that it did not control the definition of waters or certainly did not have an overwhelming impact on the definition of waters. Thank you, Justice Thomas. Yes. In terms of the case law, no decision of this Court has ever relied upon 404G to affirm the version of adjacency that the EPA and the Court advance. The most was Riverside Bayview, which said that 404G simply means that some wetlands will be regulated. But the Court was not willing to go much beyond that. And with respect to how adjacent actually appears in 404G, given the context of physical topographic features, I think the most plausible understanding of that term is that Congress simply meant that those wetlands that are physically touching, the very facts that were at Isshin Riverside Bayview, the fact that Riverside Bayview's property was essentially a cattail marsh that blended into Lake St. Clair. And I think that is the most that 404G says. And again, that's a proposition that the Sackett's test is fully consistent with. The Sackett's acknowledge that some wetlands can be regulated under the line drawing problem standard. It's just that nothing in 404G can reasonably be interpreted to represent some general congressional ratification of the Court's adjacency regulation from 1977. Thank you. Justice Alito? Well, this case may have an important nationwide effect, but we do decide concrete cases and controversies. So I would like you to address the theory that the government uses to determine that the Sackett's property constitutes wetlands that can be regulated. The property, as I understand it, is separated from wetlands by a road. Isn't that right?  And then a roadside ditch on the other side of the road. That ditch then spills about a half mile downstream into Kalispell Creek, which then itself spills another 1,000 feet from that point into Priest Lake. And how does the water from the Sackett's property get to the ditch? The short answer, Justice Alito, is that the water doesn't get to the ditch. It doesn't get to the wetlands. It doesn't get to Priest Lake. There is no surface connection from the Sackett's property to any plausible water. What is the government's theory of how the water from the Sackett's property gets to the wetlands? The government doesn't have a theory for that, which I think underscores how broad the significant nexus test is. The government's theory is that the wetlands on the other side of the road, which are not connected to the Sackett's property, that those can be combined with the Sackett's property on some theory that they're similarly situated, and only because the government then combined the 36 acres of wetlands that it could then conclude that there was a significant relationship to Priest Lake. So it's only by combining the water from the Sackett's property with this large wetlands that it comes to the conclusion that there's a significant ecological effect on Priest Lake? Yes, Justice Alito. Priest Lake is navigable? Yes. Does it cross a state line? No, it does not cross a state line. If someone puts a boat in Priest Lake, is it possible to get to another state from Priest Lake? Well, we'd probably have to negotiate some rapids through Priest River, but I think it's fair to say that Priest Lake would certainly qualify as a water of the United States according to the interpretation that the Sacketts have offered. Thank you. Justice Sotomayor? Yes. Counsel, I think that there has been a misreading, and I obviously could be doing it, but I have read Justice Kennedy's significant nexus test, and as I read his decision, he was of the view that adjacency defined wetlands that were adjacent to navigable waters, and that he was applying the significant nexus test to deal with non-navigable waters that might be waters of the United States. And so I think that there are two issues in this case. Justice Alito referenced only one of them, which is whether or not the tributary that runs from the Bay Fin to the Sackett site, whether that is a marshland, that constitutes a water of the United States. That's what the Ninth Circuit saw. But there is also the Sackett site running directly to Priest Lake, and that Sackett site does run across below a road and below some houses. I believe the government's position, and it could speak for itself when it gets up, is that that connection is very direct, that there is a subsurface flow, not a groundwater flow, but a subsurface flow of water. Isn't that, am I correct about the factual nature of this case? Justice Sotomayor, you're correct that the record contains some evidence to the effect that there is a subsurface flow from the Fen wetlands that are north of the site, south underneath the Sackett property. I'm not going that far. I'm going from the Sackett site to Priest Lake. There's some evidence there's a subsurface flow there. That is correct. Now, as I understand it, there's a difference between groundwater and subsurface flows. Am I correct about that, too? I don't believe, Justice Sotomayor, that EPA has ever made such a distinction, and certainly in the position of someone like the Sacketts, there practically is no distinction, whether it's subsurface or really subsurface. Well, I think it's not that hard. I mean, yes, you can see it, and you can see subsurface water when you put your foot in the sand and you can feel it underneath the top of the sand. You could feel it in how watery your soil is. I mean, it's not impossible to know that there's a subsurface. You could put a stake or something into it and feel it immediately or have it spring up immediately. So there is a difference between groundwater and subsurface water, isn't there? Justice Sotomayor, I don't believe legally there really is any distinction. Again, if the relevant point is can one distinguish anything on the Sacketts property from Priest Lake, whether it's subsurface or subsurface. You don't think there's a difference? Well, one thing, Justice Sotomayor, that I think is problematic with relying upon any sort of subsurface connection is that it essentially renders the test limitless. I mean, it's hard to imagine. Why? It's hard to imagine any property in this country that does not have some degree of subsurface flow at whatever depth that will ultimately, I mean, the hydrological cycle is unified. Ultimately, that water is going to flow to some surface water. It's hard to imagine that Congress could have intended, especially in a statute that imposes such significant penalties for someone who guesses wrong as to whether or not his or her property is regulated. Well, that goes back to Justice Jackson's point that what Congress was concerned about was ensuring the sanctity of our waters and that those things that directly discharged into it would be safe, to keep our waters safe. Well, Justice Sotomayor, I also think Congress was concerned about the sanctity of freedom and private property rights and ensuring that people at least have fair notice as to whether their property is going to be regulated. Well, I mean, why is it fair, whatever test, even yours right now, as in your answers to the Chief Justice said that we'll have to define what a normal season is, we're going to have to define how many days are continuous. So it's not a question that any test that's being proposed won't have some lack of security for homeowners. The one thing about the EPA process is you can always get, you can always ask the EPA for an opinion as to whether or not you fall within the definition. Yes, Justice Sotomayor. And you then have an opportunity to fight that definition, correct? That is correct, Justice Sotomayor, but I think that actually indicates why something like the significant nexus test is so problematic. It's hard to imagine any other statutory system in the federal code that requires a potentially regulated party to initiate a rather expensive and time-consuming process just to find out whether in fact one is regulated. And that's precisely why the jurisdictional determination process has been developed in the age of the significant nexus, because it is a test. It's very difficult to know whether in fact one is regulated. Well, a test applies, as I mentioned, only to connections that are not directly with waters. That's a different issue. But that's not how you brief this case or what we're looking for. We're looking for a definition that has to do with a connection that exists with traditional navigable waters. We may have to develop, as was the insight of Justice Kennedy in Rapanos, a different test like the significant nexus test for those connections like here where there might be a tributary somewhere else. Justice Sotomayor, I would say that if the test is subsurface connections to a traditional navigable water, I guarantee you that this case or something like it will be back here in another 16 years, and we will be back in the same place that we have been with property owners not knowing whether they are regulated, with the states not knowing what test to apply. That's assuming that subsurface water is not differentiated between groundwater. Justice Sotomayor, again, I don't think that there is certainly a legal distinction that EPA has ever articulated between the two. And moreover, I think as a practical matter to the property owner, if it's subsurface, it doesn't necessarily follow that one standing in a marsh. The Sackett's property certainly wasn't a marsh. Only because they put gravel in it. I'm sorry? Only because they put gravel in it. Well, the original state of the property was before the topsoil was taken out and the gravel was put on it. It looked like a buildable lot. In fact, it was zoned as a buildable lot. It has a sewer hookup. It has an address. Neighbors around that property had built. There's no sense that this property is something that one might think, ah, there's water somehow flowing underneath it that connects it to Priest Lake. That's not the type of topography. Thank you, counsel. Justice Kagan? Mr. Schiff, do you think there's any third position? I mean, I understand that you don't like the significant nexus test, but I'm going back really to Justice Kavanaugh's point about, you know, take something like you just create a dam and the dam breaks up, and the idea that there's a continuous surface connection. So if I think, well, in that kind of situation, you can't be right, but I also understand some of your points about the significant nexus test. Is there anything in the middle? To some extent, Justice Kagan, I think a middle position is the idea of the nature of the barrier. I think this came up a little bit, whether it's a natural barrier or whether it's a permanent legal barrier like the roads that bound the Sackett's property. But in a sense, it's not a particularly satisfactory middle position because it still doesn't really afford appropriate fidelity to the text. Again, if Congress could tomorrow enact a statute saying continue to assume that 1344 means more than you think it means and suggest that there is something in the text that says we're supposed to figure out what it means for an adjacent wetland, for a wetland to be adjacent. So if I'm thinking of Justice Kavanaugh's example and thinking that looks pretty adjacent to me, but on the other hand, I'm thinking of some of the objections that you have as to the Kennedy test, what do I do from there? Call it a backup position, call it a compromise position, call it whatever you want. Is there a third option? In that sense, Justice Kagan, I think there is. I mean, it's exemplified by the facts of the Sackett's case in that there's no service connection from the Sackett's property to any plausible water. Let's just repeat in your test. I'm asking you for a test that's different from your test. Well, I would hesitate a little bit to say it's the same thing because our test is a line drawing problem test. But one could say that whether there might be marginal challenges about defining boundaries in other cases, certainly where there's no service connection, there cannot be any plausible argument that the wetland itself is inseparably bound up with an abutting water. So your answer is no. Okay, thank you. Justice Gorsuch. Return to where Justice Sotomayor left off, and that is adjacency. If we're going to have something more than a continuous water surface test like we did in Riverside Bayview, if we're going to expand beyond that, why not just look at the geographic proximity between this property and the lake? The lake is the waters of the United States that EPA wishes to protect, understandably. They've got a circuitous route across a road down a drainage ditch to an unnamed tributary to a named tributary to the lake. That's their adjacency theory. It's kind of a daisy wheel spun out from the lake. But that's rather complicated when one looks at the map, and it's the back of the petition appendix, the picture. You're blocked from the lake. Why isn't that just adjacent enough? Now, there's a subdivision between you and the lake, I understand, but pretty close, a lot closer route that way than this rather convoluted path around. Justice Gorsuch, I think the reason why that's not satisfactory, and I recognize that I've given this answer in more than one form several times already this morning, but I would still go back again to the text. Obviously, Congress knows about wetlands. It included a reference to wetlands in 404G, among other places. It chose not to include that in the definitional section. That has to mean something, and what that means is that the relevant jurisdictional entity is water. If something cannot be reasonably classified as a water, taking into account the line drawing problem standard, then the answer is simply Congress hasn't authorized it. Maybe it is a good idea in terms of water quality, but that's for Congress to decide, obviously, not for the court, and that really has to be why mere geographic closeness can't justify the contritextual conclusion that a two-third of an acre residential lot with a sewer hookup with an address and a mailbox is somehow considered a water of the United States. And that is what's being asked, is a person who purchased a property with a sewer hookup a block from a lake with a subdivision between you and the lake and a road on the other side is supposed to know that that's a water of the United States, that piece of property, or else what? What are the penalties associated with this? What was threatened to your clients, and what does one face in these circumstances? Well, certainly for the Sacketts in particular, they were threatened with significant civil and administrative penalties, and of course also the continuing liability of having to restore the property to the way it was before they began any work. But also there is lingering over all of this discussion the threat of criminal penalties, and I think this is particularly important because the waters of the United States is as much relevant to the criminal portions of the Clean Water Act as the civil portions. It's the same text, and I think that should give the court particular concern in indulging any sort of malleable or somewhat unclear or flexible test that is exemplified by the significant nexus test. Justice Kavanaugh? You keep emphasizing the text, but you agree that some wetlands are covered as waters of the United States, correct? That is correct, Justice Kavanaugh. And so the question then becomes, as I see it, does the statute, does the text, cover only bordering or contiguous wetlands, or does it also cover what we might call neighboring wetlands? Is that an appropriate way to phrase what you think the precise dispute is? Yes, that is correct. Okay, and on 404G, which, as Justice Barrett says, is critical here to the case, is your argument that 404G does not control or even illustrate what qualifies as waters of the United States, or is your argument that adjacent, the word in 404G, does not mean neighboring or nearby, but requires actual touching? Justice Kavanaugh? Or both? I would say it's both. I would say, again, following precisely what Riverside Bayview, which is essentially the zenith of this Court's indulgence of EPA and the Court's interpretation of the Act. At most, Riverside Bayview was willing to say that 404G simply means that, well, we can't interpret waters to categorically exclude wetlands. And that's all that the Court was willing to say. Once you get there, aren't you a little bit separated from the text as you see the text? In other words, I don't know that you really agree with Riverside Bayview when it comes down to it. You're not asking for it to be overruled. Well, Justice Kavanaugh, to be frank, we weren't all textualists then. But today... So, but then you're asking us to put what you're calling a textual limit on something that's divorced from the text to begin with, it sounds to me like, rather than going with neighboring, which is the ordinary dictionary definition of adjacent, and also would... I'll leave it there. Well, Justice Kavanaugh, with respect to the ordinary understanding of adjacency, I certainly agree that in the abstract, adjacent has more than one meaning. But I do believe that in the context of 404G, where it's trying to describe relationships between topographic features, that the most reasonable understanding, really the only plausible understanding, is that it means physically touching. Again, when you combine it with the fact that the central definitional... Last question. Why did seven straight administrations not agree with you? Well, I wouldn't quite say it's seven straight. At least under the Trump administration, their proposal was certainly closer to what... Let's be clear. They said that it would still be covered even if it was separated by a berm or dune, for example. No, that is correct. And under your test, that would not be covered. That is correct, Justice Kavanaugh. And I don't presume to know more than those seven prior administrations. But what I do know is what is the text that Congress has used. And nothing can supersede that. Thank you. Justice Barrett. Mr. Schiff, can you explain to me why you wouldn't lose? Because I take it you're saying that you wouldn't lose if we had dropped a broader definition of adjacent, akin to the one that Justice Kagan is proposing. Justice Barrett, I may have misspoken. If adjacent means that something is not adjacent, if there is a man-made barrier as opposed to a natural barrier, then obviously here the Sackett's property is bounded by man-made barriers. And so what I meant to say is that whether or not if the court thought that natural barriers might not defeat jurisdiction, the court could also say that at least here with man-made barriers, there is no jurisdiction. Okay. I think I didn't articulate my question clearly enough. So part of what you've said is that 1344G, Congress was doing something different and that it didn't modify the definition of waters of the United States that was existing. Okay. So here's my question. It seems to me, and this is kind of what Justice Jackson was getting at, that that might be true, that 1344G was doing something different. But what it was doing was carving out what the states could and could not regulate. And if adjacent means something broader, and this is what I was just starting to ask you when time expired, if adjacent means something broader, then it seems to me that there's a category of wetlands that nobody could regulate. So it seems to me that even though 1344G was doing something different and even though Congress didn't modify the definition of waters of the United States, that adjacent matters to this case. And if we adopt the definition Justice Kagan is proposing, that you would lose. Am I right? Justice Barrett, if I understand what Justice Kagan is proposing, that neighboringness or their closeness is sufficient, then necessarily, then the Sackett's property and a lot of other property in this country is going to be regulated. So in that respect, 1344G does qualify or cast light on the definition in 1362-7 of waters of the United States. It certainly does, and as I responded to Justice Kavanaugh, the way it casts light is to indicate that, to some extent, wetlands are going to be regulated. The extent to which they're regulated, I think that has to be, in a sense, a tail-wagging-the-dog problem. But that depends on our accepting the narrower definition of adjacent, correct? I mean, I see why your whole theory hangs together if adjacent means abutting. Right, Your Honor, and what I mean by tail-wagging-the-dog is that I don't think it's really appropriate to look at how adjacent is used in 404G and then use that to sort of reinvent what the central definitional section from Section 502 is. Rather, it's the other way around. It's precisely because Section 502 was not changed, that the criterion remains waters, that that must then inform what adjacent means in Section 404. And is the idea partly that because 1344G was enacted in 1977 and 1367, or 1362-7, was that 1972? Yes, that's correct. But in any event, it was preceding that the later legislation doesn't cast light on what the original meaning of waters of the United States was? Well, it's certainly not definitive. It's not a ratification. And I don't want to go too far, Justice Barrett, in saying that it means nothing, because, again, Riverside-Bages says it does mean something. But, again, it would be strange, it would be sort of an inversion of statutory interpretation to say that this parenthetical reference in a provision dealing principally with permit transfer authority suddenly backfills and dramatically changes the scope of the central definitional portion of the Act. Again, a portion that is as much an issue in criminal prosecution as it is in civil matters. Thank you. Justice Jackson? Sorry. So you said several times that Riverside-Bayview said at most that some wetlands could be regulated. But under your test, it appears that you are requiring visual indistinguishability. And I'm trying to assess whether or not Riverside-Bayview actually gets you there. In that case, was it clear that the marsh area was visually indistinguishable from the abutting creek? Yes, Justice Jackson. That is precisely how the government argued it in its briefing and in oral argument. We quote that portion in our reply brief, where the emphasis is on how, I believe these are the words that were used, that from Riverside-Bayview, it would not be an exaggeration to say that one, after wading through a cattail marsh, could then swim into Lake St. Clair, that it was a continuous body of water that at some point ended. And the court, in looking at those facts, said that it's appropriate to defer to the court and the EPA in saying that the water ends at this point because we can't otherwise say whether it's reasonable to have it end at an earlier point. But is that going to be the case in every situation, that it's indistinguishable as to when the marsh ends or the wetlands end and the creek begins? I'm just trying to imagine whether people were really confused in Riverside-Bayside as to which part was wetland and which part was water. And is that your test? We have to have a visual indistinguishability. Justice Jackson, there was certainly a dispute among the parties as to the proper characterization of the facts. But I think what matters are two things. One is how the government presented those facts to the court and how the court ultimately crafted a decision based upon those facts, meaning that the court concluded that, as it said, between dry land and open water, the transition is not necessarily or even typically an abrupt one and that you have all sorts of features in between those two points. And the court said that it's not our place to second-guess the agency's determination that in drawing the boundaries of waters, which is the central jurisdictional term, in drawing the boundaries of waters, it's not unreasonable that there may be some semi-aquatic features that are brought into that boundary. So under your test in future cases, are we going to be debating in every case the extent to which there really is visual indistinguishability? Absolutely not, Your Honor, and I think that if there were disputes, those disputes would pale in comparison to the number of disputes that have percolated throughout the lower courts over the last 16 years with respect to the significant nexus test. This test, the line drawing problem test, is much simpler to apply. Thank you. Thank you, counsel. Mr. Fletcher. Thank you, Mr. Chief Justice, and may it please the court. As the discussion so far illustrates, everyone agrees that the waters protected by the Clean Water Act include some adjacent wetlands. The narrow but important question presented in this case is whether wetlands lose protection if they're separated from other waters by a barrier like a berm or a road. Overwhelming scientific evidence and essentially undisputed scientific evidence shows that those sorts of barriers do not diminish wetlands' essential role in protecting the integrity of other waters. As Justice Kavanaugh emphasized, for 45 years, the EPA and the Army Corps have recognized that the presence of such a barrier does not categorically strip a wetland of the Act's protections. This court should uphold that longstanding interpretation for three reasons. First, in 1977, Congress was presented with proposals to limit the Act's coverage that sounded very much like the proposal that you just heard, and it rejected them. Instead, it adopted Section 1344G, which includes express textual recognition that the waters covered by the Act include adjacent wetlands. The court recognized in swank in the language that Justice Sotomayor quoted that that was an unequivocal approval of the Corps' regulation on adjacent wetlands. Second, this court unanimously upheld those regulations in Riverside Bayview. Now, it's true that the marsh issue in that case happened to directly abut a creek such that one could wade from one and then swim in the other, but the court did not rely on any difficulty in identifying the boundary between the creek and the lake, and there wasn't one. Instead, the court relied on what it called the agency's ecological judgment that wetlands significantly affect neighboring waters, and the presence of a berm or other barrier does not sever that connection. In fact, as the 2020 Navigable Waters Protection Act emphasized, the presence of a river berm can itself be evidence of the close connection between the river and the neighboring wetlands. Third, and finally, the agencies are now doing what members of this court have repeatedly urged them to do by promulgating regulations that recognize and appropriately limit the coverage of the act. Those regulations incorporate the significant nexus test, which is a limiting construction that ensures that the act reaches only those wetlands that must be covered to reach the traditional navigable waters in which the federal interest is indisputable. I welcome the court's questions. Under the position of the federal government, is an ecological and biological connection between wetlands and navigable waters enough to bring the wetlands into coverage? In other words, dry land between it, but underneath, we had that case in Hawaii that indicated how far underneath it could go. There is a biological connection. You put some tracing materials in the wetlands and they do find their way to the lake. Is that enough under your view? Not any connection. We're not talking about the possibility that some molecules of water eventually make their way from the wetlands into the lake, but instead what we take to be the significant nexus standard from Justice Kennedy's opinion in Rapanos, which traces back to Swank and Riverside Bayview that demands a significant effect. What does that mean? How much of a biological connection does there have to be? The agencies now have more than a decade of experience applying this in practice, and they explained in the guidance that they issued after Rapanos and have reiterated and refined in the NPRM that they just issued in December of 2021 the factors that they consider in assessing significant nexus, and it includes things like distance to the tributary, distance to the downstream traditional navigable water, the volume of the flow, the hydrology of the area, the presence of other wetlands. So if the Sackets or anybody else are walking around the area, they could look at something and see how long, what's the distance factor? The distance factor isn't a bright line rule. They know it's not a bright line rule, but they have to figure out if a certain amount of whatever kind of tracing thing you use is deposited in the wetlands. They then have to figure out if that makes it all the way to the lake, no matter how far away it is. And I think as your friend pointed out, I forget what the phrasing was, but water goes everywhere eventually, right? And so there's probably going to be a biological or ecological connection of some sort. So I'd say a couple things. First of all, this case is focused on provisions addressing adjacent wetlands. There are other provisions of the regulation dealing with isolated waters that aren't at issue here, but for purposes of this case, there has to be a showing of adjacency. And right now, the Corps and the EPA have not tried to reduce that to a bright line rule. They tried that approach in the 2015 rule, and that was criticized by many as being arbitrary. Have they tried to reduce it to a vague rule? Yeah, I think they've said reasonable proximity, and they've said that reasonable proximity depends on the hydrology of the area. If you have a flat floodplain where often floods from the river reach waters or wetlands that are at some distance from the river. So somebody looking around a lot would have to look at the wetlands if they can see them and the lake and say, is that reasonable proximity or not? That's right, yes, that is the standard. That's the standard that is used in criminal prosecutions as well. That's correct, Mr. Chief Justice, but I don't think that's an unusual standard in regulatory or criminal statutes, and as the most recent example, I'd point to the court's last Clean Water Act case, County of Maui, where the court adopted a standard for indirect discharges into the navigable waters, and the dissents criticized that standard because it was a multi-factor test that was not capable of being reduced to precise rules. Yeah, but the sewage plant was pretty proximate to the ocean, right? How far away was it? I don't remember exactly how far apart, but it was pretty proximate. But on the other hand, the Sackett's wetland is pretty proximate to the tributary and the lake. We're talking about 30 feet to the tributary and just 300 feet to the lake itself. Well, yeah, in the Hawaii case, though, we were talking about a big sewage plant. So that's right, Mr. Chief Justice. I guess I think this gets to another issue in the case, which is that what we're talking about now is whether wetlands are brought within the Act's coverage at all. The fact that they're covered by the Act does not mean that development is prohibited. It just means that development has to be permitted, and if the Sackett's wetlands would not significantly affect or degrade Priest Lake because of their location or their size or anything else, that's something that's appropriately taken into account in the permitting process. This is just about which wetlands are going to have some examination to make sure that that degradation does not occur. To clarify some of the answers that you just gave to the Chief Justice, I mean, the statutory language is of adjacency, and at certain points in your answer you suggested that the significant effects test is really just a test that you use to evaluate whether there is sufficient adjacency. At another point, when you talked to the Chief Justice, you said that the test was reasonable proximity. Is reasonable proximity the same as significant nexus? Is what you're doing trying to figure out how, other than by demand and strict contiguity, one defines adjacency? And then dealing with the hard issue of it just doesn't seem as though it should be 50 but not 51, but I think what the Chief Justice is asking you is, well, what do you look to then? Name the three things that matter when you're saying, is something adjacent enough? Right. So significant nexus and adjacency are separate concepts. Adjacency traces back to the original regulations from 1975 and 1977, and picked up in Section 1344G, the agencies have long said that adjacent wetlands are covered. In Rapanas, Justice Kennedy's concurrence said that for traditional navigable waters, he accepted that adjacency alone was sufficient to justify inclusion, but for wetlands that were adjacent to tributaries further upstream, Justice Kennedy thought that some additional show had been made. Okay, then if you're going to separate them, which I had thought that you hadn't done, so my mistake, but if you're going to separate them, where does the significant nexus test come from? So I think it's a limiting construction that limits the sort of, the broad language of the statute is waters of the United States, and as I think the Court has recognized, that could conceivably cover literally every body of water in the country. We know it doesn't mean that. We also know it means something more than just navigable waters. And so we need a test to figure out which additional waters are covered. And what the significant nexus test does is it says it's permissible to sweep in additional waters if they significantly affect the traditional navigable waters that were the sort of core focus of the Act. You haven't told me where that comes from. I mean, it sounds like a very good idea to have such a test, but where does it come from? From this Court's cases, which say you have to give effect to two things. The term being defined is navigable waters, but the definition is broad and doesn't include any requirement of navigability. And the way we read Riverside Bayview and Swank is to say, you can include other waters that are not themselves navigable, but the justification for including them has to be their effects on the traditional navigable waters that are the core of the statute. Things like migratory birds, that was the issue in Swank, aren't good enough. And they need not be adjacent. So what Justice Kagan's questions is getting to, and I want to make certain I understand it because it's important to me, the significant nexus test is separate and apart, so it can be not adjacent, but so long as there's a significant nexus that's still covered. It's untethered from 1344G in that respect. I want to be very clear to distinguish between what we think is you have to decide in this case and then also in candor tell you what the agency's view is about other circumstances. So this case is about the regulations dealing with adjacent wetlands, and as to those wetlands, the agencies think they're covered if they're adjacent to traditional navigable waters or if they're adjacent to upstream tributaries and they satisfy the significant nexus test. It's an additional limiting construction that narrows the scope of the act. I'm sorry. I was just going to say the agencies have also said, and this is reflected in the notice of proposed rulemaking, they would cover other waters, even if they weren't adjacent to navigable waters, if they could satisfy the significant nexus test. But that's not really before you here because everyone agrees that if you accept our view that adjacent means neighboring, then the Sackett's wetlands are covered. I'm sorry, Justice Scalia. What is your understanding of the term waters? So our understanding of it is reflected in the agency's regulations, which have for 45 years spelled out the different sorts of waters that are covered. I think if I were going to reduce it to a phrase, it would be geographic features that are characterized by the presence of waters. And I think where I'd part ways with my friend is that I'd say that's not just lakes, streams, and rivers. It's also marshes and swamps. Any geographic feature that has water in it, at least at some period during the course of the year, that falls within the term waters. So again, as I said, this is something that the agencies have fleshed out over many decades. And one of the things that they've done is exclude both because of particular statutory provisions, excluding particular types of waters, and also because the agencies as a matter of regulation have excluded things like irrigation ditches, waste treatment systems, small erosional features, those sorts of things. They can be man-made features, right? That's correct, yes. Why aren't irrigation ditches included? I think irrigation ditches aren't included both because the agencies have made the determination that it doesn't make sense to include them, and also because typically irrigation ditches bring water from the waters of the navigable waters, canals, rivers, things like that, and distribute it out into rivers. They're not bringing water back into the navigable waters. Well, if we forget about everything the agencies have done and everything this Court has said about the question of what constitutes waters, what would you say is the definition of waters? A definition was provided by the plurality opinion in Rapanos. You disagree with that. Does it include any place in the United States that has water in it? No, I don't think it does. I accept the Rapanos plurality's idea that it is geographic features characterized by the presence of water. I'd go further than that and say that wetlands can easily fit that description, and I acknowledge that there are some difficult cases about how do you distinguish between a wash and an intermittent or a seasonal stream or a river. Those cases really aren't before you here. This is a case about whether adjacent wetlands are waters, and I think on that point the sort of clearest place to look is Section 1344G. No, but we need to know what waters of the United States means. That's what we're interpreting. We're really not interpreting 1344G. 1344G may shed some light on what is meant by waters of the United States, but we're interpreting what is meant by that phrase, that cryptic phrase, that strange phrase, waters of the United States. I agree exactly with the description of what the court ought to do, and my point was just that it's a difficult problem of how to interpret it and apply it to all of the different water features in the country, and I was trying to emphasize that the specific question before you is what to do about wetlands adjacent to other waters, and on that point 1344G's text and history, I think, speak very clearly and provide, in our view, dispositive guidance about how to interpret and apply that general statutory language. But the text doesn't say in referring to adjacent in 1344G whether that means bordering or contiguous and stop there, or also include neighboring as the regulation does, and as I understand the case really, as your brief set it out, it comes down to, okay, what about a wetland separated by a berm or dune or by a dike or levee, and on that question, I suppose, since Congress hasn't specified that it goes that extra step, why not let Congress figure out where the line is, and I think that's the toughest hurdle you face is that Congress has gotten, as Justice Alito says, from waters to adjacent and now from contiguous or neighboring to contiguous or bordering to also neighboring, and shouldn't that be Congress's job? So what's your general response to that? So I think if you look at 1344G in context, Congress has answered this question. We think you'd get there past just directly abutting and to neighboring on the dictionary definitions alone, the definitions we say at page 22 of our brief, but I don't think you need those here because of the history against which Congress acted. And, Justice Barrett, this goes to your question about the chronology. The Corps of Engineers first defined the waters of the United States to include adjacent wetlands in 1975 in interim regulations issued in 1975, and those regulations said adjacent or contiguous to, and so I think already made clear that we're not just limiting to contiguous regulations. Then it spelled it out only in 77. Then in July of 1977 it spelled it out. It said we're deleting contiguous because that's a subset of adjacency, and we're making explicit that the presence of a barrier like a berm or a dune is not enough to defeat adjacency. And then Congress comes along in December of 1977, and in this carve out in 1344G, which is dividing up which waters are going to be covered by the states, which are going to be reserved to the federal governments, and in doing that Congress drew a line that was reflected in the Corps' regulations. The Corps had, when it expanded jurisdiction out, it said we're going to phase in this expansion of our jurisdiction, and we're going to start with traditional navigable waters and their adjacent wetlands, and then we're going to move to other things later. And what Congress did in 1344G was say the federal government is going to keep permitting authority over Phase I, and the states can take permitting authority over everything else. And I think that context makes it especially clear that Congress was picking up the concept of adjacency that was reflected in the Corps' regulations. It's kind of a bank shot way to do it, to acknowledge that. So I guess, Justice Kavanaugh, I think... And you used the phrase shed light on. What does that mean? Well, I think confirm that the agency's understanding was correct. So, you know, this is the term waters of the United States, the Corps, the EPA, the Department of Justice, the courts, all interpreted that to reach adjacent wetlands. And Congress was then presented with a lot of the same objections you're hearing now, with people saying this is too much of an intrusion on the states, this is messing with farming and ranching and other activities. And there was a serious proposal to curtail the jurisdiction in the way that they suggest. And Congress carved out farming and agricultural activities. Exactly right. They did something different. It said we're not going to accept the proposal to carve out wetlands from the Act's coverage entirely. Instead, we're going to do two things. Three things, actually. We're going to carve out certain activities like farming and ranching. We're going to transfer permitting authority over some wetlands to the states to give the states a greater role in things. And then we're going to ratify this concept of general permits to streamline the permitting process. So it was sensitive to these concerns, but it rejected the idea of carving off wetland coverage in the way that petitions are now. If 1344... I'm sorry, I'm sorry. Justice Gorsuch. Thank you. Mr. Cutler, I understand your concept of adjacency and how it differentiates from substantial nexus. So your first point was that if it's adjacent to a water of the United States, we're done. We don't do the substantial nexus test. And I want to understand how much adjacency is adjacent. I think you indicated that you thought that this property, and I just want to make sure I heard you right, that this property is adjacent indeed to a water of the United States because it's close enough to Priest Lake itself. That is my view. I want to be clear about how the case has developed, though. I just want to make sure. I just want to understand that's the view of the government. Despite the fact that there's a subdivision between this property and the lake, it's still adjacent to the lake. That's the government's view. And it's adjacent. Why? What's the definition of adjacency that's independent from substantial nexus? And then I have a couple of follow-ups to that. Sure. So the agency's understanding of adjacency is neighboring, and they have cashed that out by saying it's a reasonable proximity to a covered water. Is there a mileage limit to that? So they haven't tried to do that. They did try that in the 2015 rule. They said they are anything within 100 feet or anything within the 100-year flood plain and 1,500 feet. But those have been rejected. Those have been rejected. So does a reasonable landowner have any idea? So, for example, in Priest Lake, I imagine that most of the water flow and rainfall and snowfall in quite a large geographic area drains into the lake eventually, or wishes to unless diverted. Would that whole watershed be adjacent to? So I don't think so, Justice Gorsuch. And also, I am sympathetic to the idea of how does a landowner know under the standard whether their land is covered? It's important to recognize that there are other limits, too. Would they have to actually be wetlands? No, I understand that. I'm just asking about adjacency. I understand. How does anyone know, any reasonable person know, within maybe several hundred square miles in a watershed that drains into a body of water that is the water of the United States, know whether or not their land is adjacent to? So I think we are talking about adjacency, and that may not be something that gives you bright-line rules, but it rules out things that are many miles away. Does it? Are you sure the EPA would take that view? I've asked this question. The agencies have told me they do not draw bright-line rules. They do not think 300 feet is unreasonable for adjacency. So how about 3,000 feet? Could be? I don't know the answer to that, Justice Gorsuch. Could it be three miles? I don't think it could be three miles. Is there a process for... I'm sorry. So it couldn't be three miles? I don't think it could, Justice Gorsuch. Could it be two miles? Again, when we start to talk about miles, that sounds too far to be... One mile? I don't know what you meant to me. Again, and I see where this is headed, but again... So if the federal government doesn't know, how is a person subject to criminal time in federal prison supposed to know? So the agencies, in recognition of this problem, make available free-of-charge jurisdictional determinations as to any property. They also publicize their manuals and make available on websites every jurisdiction... They're manuals that don't tell us the answer. So I understand, Justice Gorsuch, and I think you could make similar criticisms, and dissenting justices did make similar criticisms of the functional equivalent to an indirect discharge standard in the county of Maui. And the court recognized that sometimes Congress gives us laws where the text isn't susceptible of bright-line rules. I think adjacency is one of those. I'm done on adjacency. I've got some substantial nexus questions, but I've got a colleague who wants to ask a question first. Yes, I just wanted to follow up on Justice Gorsuch's very fair points, which were my points. How do people know? Is there a process by which a homeowner can ask? Yes. Any homeowner can ask the court for a jurisdictional determination. The court makes those available free of charge. And so you're not really facing criminal liability without the opportunity to get an assessment from the government regarding your particular circumstances. That's correct. All right. What happens if the government's determination, based on this multi-factor test, is that you can't develop your property? Then what recourse does the homeowner have? The homeowner can challenge that determination. If we're talking about a determination that you can't develop, that wouldn't just be a jurisdictional determination. That would have to also be a permitting decision. What if the homeowner doesn't agree with the jurisdictional decision? This court's decision in Hawks makes clear that the homeowner can seek judicial review of that at that point without potentially incurring any penalties can challenge the jurisdictional determination there. And can also seek a permit. That is, I think it's important to emphasize just again, that being covered by the Clean Water Act doesn't mean no development. It means review. And the court have taken a lot of steps at Congress's behest to streamline the process through the availability of nationwide permits for things like road construction, for the development of dams, for single-family home construction in order to... But the site-specific, which is applicable to the package, you don't dispute in your brief that that can cost hundreds of thousands of dollars in B years and years. It's just the general permitting that gets you out of that and gets you in the $14,000 range in the shorter term. So we think the several hundred thousand dollars is exaggerated for the site-specific permits as well. The same source that we cite on page 37 of our brief for the $4,000 to $14,000 for nationwide permits gives numbers of $17,000 to $35,000 as the usual cost for site-specific. That's right. And it's also important to recognize that those site-specific permits often involve much bigger projects that could be major developments spanning many, many acres. So that's the agency's best estimate of the cost of a typical... So Rapanos was just wrong in citing that statistic. In our view, that statistic is not consistent with the best information we have now, and that's from the 2021 regulatory impact analysis of the reissuance of the nationwide permits. Your adversary, the other side, I shouldn't call him adversary, the other side, argued that Mr. Sackett could not tell this was a marshland. Is that true? Because you said the first thing is it has to be a wetland. So I don't know what Mr. Sackett could tell, and I don't want to speak to that. What I can speak to is what's in the record, which is communications from the Army Corps to the prior owner in 1996 saying this is a jurisdictional wetland, you would need a permit to build, so here's information about how to seek nationwide permits. And we also have the pictures of the property that are at Petition Appendix 37 to 39 and also in the Joint Appendix. Now, we don't have pictures before it was filled in with gravel, but the pictures after it was filled in with gravel show that the parts that are not filled with gravel have sand and water in them. And also, the Sackett's own environmental consultant who came and looked at the property confirmed the Corps' judgment that these are wetlands. I think it's also worth emphasizing that although they're now separated by the larger fin across the street by Kalispell Bay Road, historically, before the road was built, that wasn't true. It was all part of one wetlands complex, and the whole fin drained down through the Sackett's property and into it to pre-fill it. Is it possible... Go ahead. Just one last question, and borrowing from what Justice Kagan did before. As you can probably tell, some of my colleagues are dubious that this is precise enough definition, adjacency, to survive. So is there another test? Not the Rapanos test, not the adjacency test, not the significant nexus test, but is there another test that could be more precise and less open-ended than the adjacency test or the significant nexus test that you use? Is there some sort of connection that could be articulated? I'd say a couple things about that. First of all, if you're in that world, you're past the sort of line-drawing problem or the notion that wetlands aren't really waters and so are only covered if they're indistinguishable. Instead, we're making a judgment about which wetlands are appropriate to cover because of their effects. Now, there are different ways to draw that line. Justice Kennedy articulated the significant nexus test. But that's when it's not adjacent, correct? That's when it's not adjacent to a traditional navigable water. That does apply. I want to go because we seem to be searching for wetlands adjacent. So let's stick to that. Right. So for wetlands adjacent, if you want a sort of crisper, clearer definition of adjacent, as I think my colloquy with Justice Gorsuch illustrates, I think it's difficult to say that there's one single bright-line answer. The agencies are taking comment on this and are considering whether there are things that they could do to provide greater clarity to the regulated public on all parts of the test, including adjacency and significant nexus. The 2015 rules we discussed tried to draw some bright-line rules. Those were criticized as arbitrary and over-inclusive, which is the problem with bright-line rules, but the over-inclusive or under-inclusive. But I certainly think there is a range of reasonable understandings of what adjacency means, and also I know you're focused on that, but significant nexus. Did I just understand you to say that the rule that you're issuing may in fact have more guidance than we currently have as to what adjacency means? I don't want to represent what's coming in the forthcoming rule because it's not issued yet, and by definition, the agencies haven't finished their deliberation. I will say they've sought comment on how to cash out, how to crystallize this significant nexus test and the adjacency framework that it is a part of. And they've also said that even after this rulemaking, they're interested in... When is the rulemaking coming down? So it's with OMB now. It's public that in September it went over to the Office of Management and Budget for interagency review. The agencies have told me that they still expect to issue it by the end of the year. Is it possible for you to be correct about the adjacent test as articulated so far, but the sackets win? I don't think so, Justice Kavanaugh. And why is that? So I don't take them to be disputing that if adjacency means something more than just directly abutting or contiguous with, then their property satisfies that standard because it's just 30 feet away from the tributary across the street. Because that's where we need the substantial nexus test, right? No, that substantial nexus has to go to the navigable water, sort of downstream navigable water. I thought if you're adjacent to water in the United States, you're good to go. I'm sorry. Okay, so you need substantial nexus if you're working through the tributary, which is if you look at the appendix, that great picture at the end is across the street, through a ditch, and then down through a creek, and then it eventually gets to the water of the United States. And so for that, you need the substantial nexus between the sackets property across the road and into the ditch at least, right? So yes, but with a couple caveats. If I could, you're right that you do need to satisfy the significant nexus test if you're relying on adjacent tributaries. Okay, so we're going that way. First of all, does the significant nexus have to be to the ditch across the road or all the way down to the lake? All the way down to the lake. That's the limiting work that it does. Okay, great. That's helpful. How much? It's the same question, different test. And the chief kind of alluded to this already. How many parts per million of what kind of stuff has to get from the sackets property across the road into a ditch? I don't know how far, how many thousands of feet over to a creek, and then from the creek down into the lake. So I'm going to give you a similar answer, which is to say I can give you qualitative. No, no. Respectfully, Justice Gorsuch, in law, I think there's a qualitative standard with guideposts that isn't determinative. You can call out your local friendly agent and he'll tell you yes or no. We'll tell you here the guidelines that the agencies use. They'll tell you free of charge what they think. And if you don't like what they think, you're free to challenge that in court. Yes. Okay. So we don't know until he comes out and tells you. I mean, what is the standard? I mean, give me your best shot. So do the wetlands with other similarly situated wetlands significantly affect the chemical, biological, or physical integrity of downstream waters? What does that mean? The agencies look at the functions that are typically performed by wetlands, like retention of floodwaters, filtering of pollutants, provision of flow during dry periods. And they look at the distance. They look at the amount of flow from the wetland and other wetlands down into the downstream navigable water. And they look at the climate. How is that different than adjacent? So I think adjacent is focused on reasonable proximity. I thought that was part of the test you just gave me too. Distance is one factor. But what the significant nexus test says is that if you're going to be relying on adjacency to some upstream tributary, that's not good enough to justify coverage. You have to show that that has a significant effect on the downstream navigable waters. It makes it harder to include wetlands that are adjacent only to tributaries and not navigable waters. Mr. Fletcher, is the government stopped? Is the court or the EPA stopped from going after you if you get a jurisdictional determination and they say, yep, not within our jurisdiction, not wetland, then are you protected? That's my understanding, at least for five years. Jurisdictional determinations are good for five years. And I think one of the reasons that this court gave in Hawks for why those are judicially reviewable final agency action is because they're binding on the court and EPA for that five-year period. One other question. So the significant nexus test, you said, is separate and apart and the subject of a different rulemaking and that the agency has a broader view than adjacency would be here. So the significant nexus test, I take it, would be grounded in waters of the United States and not 1344G? That's right. And if we accepted the significant nexus test, we wouldn't even really need 1344G because it would be broader than adjacency. I think potentially that's right, but I think that's what makes 1344G makes this case about adjacent wetlands an even easier case and doesn't require you to pass on the validity of that broader case. But if waters of the United States already included everything within significant nexus, then why does adjacency even matter in 1344G? Well, I think adjacency still matters in 1344G because that's expressed textual confirmation that Congress understood that adjacent wetlands are I don't think that the Act's coverage goes beyond that in ways that might subsume the adjacent wetlands theory, but I think for purposes of this case, 1344G would still be very, very instructive. Thank you. Thank you very much. Justice Thomas? Mr. Fletcher, it seems as though when there's a body of water and nearby wetlands, there's a presumption that it's covered by the Clean Water Act. And then the homeowner or whomever owns it or attempts to develop it has to opt out in some way. Can you give me an example of a body of water and nearby land that is automatically or presumptively excluded from coverage? Sure. So I think if I understand the question, the agencies have defined some automatic exclusions, you know, in addition to just anything that doesn't satisfy the significant nexus test. They've ruled out things like certain ditches that are excavated in uplands, small erosional features, things that are isolated. No, I mean, you know, I grew up in low country Georgia, and you had standing water. That was normal. And I'm thinking of something that's natural like that, that is presumptively not covered. And it's not near, not bordering on. I don't want to use the term adjacent. I'm done with that word. Bordering on a body of water. Sure. So I don't know that the agencies have talked in terms of presumptively not covered. I think the best thing that I can point you towards is in the 2021 NPRM, and this is at page 69, 432. The agencies, in explaining that the significant nexus test really has teeth, explain that they routinely conclude that waters aren't covered, and they give half a dozen or so specific examples of the types of isolated things that are definitely waters but still aren't covered because they don't have enough of a connection to the downstream. So in other words, if I was still living there, I wouldn't know until you told me. No, Justice Thomas, respectfully, I disagree with that. I think that if you have an isolated body of water, an isolated farm pond or something like that, there are some things that are categorically excluded. If you're not in one of those categories, the question that you have to ask is, is this adjacent to or is there a significant nexus with the navigable waters? And I think for an isolated body of water, the answer to that would be no. Could you, if I were concerned about the authority of EPA to regulate a purely interstate body of water or associated wetland, where would I find the authority for that? Or would you give me your best argument for the authority of the government to regulate that? Sure. I think it's authority that's common ground between us and petitioners, that the Commerce Clause gives the federal government the authority to regulate the channels of interstate commerce, including navigable waters, whether they're interstate or infrastate, if they could be used to transport commerce, that's within the commerce power. That's common ground between the parties. And then also, and this is the next step, that authority extends beyond just things that happen in the channels, but also things that happen outside the channels but could damage them. That's something that's been uncontroversial since the 1899 Rivers and Harbors Act, which extended up to tributaries and the banks of tributaries of navigable waters. And it's really necessary for Congress to be able to protect the channels of commerce to also to be able to protect activities that affect those channels. What is a channel of commerce? I'm talking about a purely intrastate, for example, a lake. Purely intrastate. How does that get to be a channel of commerce? So I point to the same case that my friend did. The Great Salt Lake was at issue in some litigation between Utah and the United States. And what the court said is, even though it's intrastate and there's no water connection to some out-of-state body, you could still move commerce across it. And that commerce could be moving in an intrastate if you married up the transport over water with transport over land. Is there a lot of transportation over the Great Salt Lake? Apparently not. That's why it was in litigation. But the court held that a little bit from the 1880s was enough. Thank you. I guess there's less of less. Justice Alito? Does your understanding of waters of the United States take into account any of the clear statement rules that have been invoked on the other side? For example, the effect on federalism, the fact that you're reading an awful lot into a parenthetical in 1344G. Your argument is that with this parenthetical, Congress did something that has major importance. And also the fact that there may be a vagueness problem. Do you take any of that into account? Yes. I think those considerations are all reflected in this court's prior decisions. And we take the significant nexus test to be consistent with those decisions and to be a limiting construction, a narrowing construction on the covered waters that make sure that the covered waters include all the waters that are necessary to achieve the goal that I talked about with Justice Thomas and that leave waters that aren't essential to that goal to the states to regulate. Okay. So it sounds like your understanding of waters of the United States is any – I come back to my earlier question. Anything in the United States that has water in it, if it has an ecological effect on navigable waters. Is that right? And then these clear statement rules narrow that. That's your interpretation of the phrase waters. I wouldn't say any effect is good enough. I think the concept is significant nexus from this court's cases, but yes. Would you win if 1344G had not been enacted? I think we would. I think the Corps of Engineers and the EPA got it right the first time when they said adjacent wetlands are regulated under the plain text of the statute. What 1344 does do is that it tells you that Congress looked at this problem, considered proposals to cut back the act, and then essentially approved the Corps' interpretation in express statutory text while adopting other changes to the act to deal with some of the concerns that were raised. Just out of curiosity, what is your understanding of the United States? Does that mean in the United States? Does it mean something else? I think it means more than just in the United States. We take it to mean waters in which there is a federal interest, waters that affect the navigable waters where the federal interest is indisputable. We take it to be sort of reiterating that point. That would extend very, very far, would it not? It's true that the act's coverage is broad. It's been understood as broad from the beginning, and that was Congress' intent. It was to comprehensively regulate the waters of the United States because the prior system that relied primarily on states had proved insufficient, in part because this isn't a problem that the states can solve by themselves because pollution that happens in one state or the destruction of wetlands in one state have consequences that may be felt in many states downstream that can't themselves regulate to address it. Do you doubt that Congress could regulate dry land on the theory that it has a significant, together with other similar pieces of dry land, it has a significant effect on interstate commerce? I think I would probably defend such a law. I think the Rivers and Harbors Act was a version of that which said you can't place refuse on the banks of tributaries to navigable waters because it could wash downstream into the navigable waters. But I think that's stretching out further, certainly, than Congress did here. So if that's the limitation of the United States, it's not much of a limitation. So, Justice Alito, I disagree. I think the proof is sort of in the pudding. The agencies have told us in proposing to recodify the significant nexus test that we're defending here today that it has real teeth, that they routinely conclude that it's not satisfied and that something like 25% of jurisdictional determinations made under the post-Rapanos guidance conclude that there's no jurisdiction under the act. So I think that's real concrete evidence that this is broad because Congress' purpose was broad, but it's not unlimited. What the agencies have done, I would imagine, is to take a very broad provision that can be read to give them almost plenary authority and make some pragmatic judgments about how far they want to go based on all sorts of factors. Is that unfair? I don't think it's unfair in the sense that I think pragmatism, administrability, considerations of policy have factored into this rulemaking, I'm sure. But I think the thing I'd add to what you said is that the agencies have also been mindful, especially in the ongoing rulemaking, of the guidance provided by this Court's decisions, which have significantly narrowed the agency's interpretation from where it was in the 80s. Thank you. Mr. Soledad? I just want to be clear. You're defending the significant nexus test with respect to use when it's not adjacent to navigable waters, correct? That's correct. So are you giving up the argument that the Sackett Wetland is covered by the Act simply because it is adjacent to Priest Lake, I thought? I didn't get a chance to get this out in response to Justice Gorsuch. What I wanted to say is the agencies do think and argued previously that the wetland is adjacent to the lake itself. The District Court upheld that determination. We didn't renew that argument in the Ninth Circuit or our briefs in this Court. We relied on adjacency to the tributary and the additional showing of a significant nexus to Priest Lake. So that's how the case has been briefed and argued as it comes to this Court. But if you're asking about the agency's view... Why did you give it up? I don't know why that decision was made. I would guess that it's because adjacency to the tributary is in some ways a simpler test. It's only 30 feet from the tributary. And because we felt confident that we could make this showing of significant nexus down to Priest Lake, it was the sort of simpler way to justify the conclusion that the property has covered. Justice Kagan? Justice Gorsuch? I just want to follow up on Justice Gorsuch's earlier questions because I think he identifies something that this Court's overwhelmingly been concerned about for decades, mens rea, and not punishing innocent people who make a mistake, an innocent mistake. So what assurance can you provide on that front that some of the hypotheticals about someone being penalized for making a mistaken but reasonable judgment about the status of their land will not, in fact, be punished? I'd say a couple things. The first one is this Court made the point in Maui that the civil penalties provisions direct courts to consider things like essentially mens rea or culpability in deciding the amounts of civil penalties. And as the Court said there, it was confident that district courts would take that into account. In the agency's experience, they do. On the criminal side of the House, it's true that the 1319d of the Act does provide for potential criminal liability for negligent or knowing violations. As a matter of practice, the agencies tell me that it's very unusual to bring criminal prosecutions absent sort of willful conduct. I mean, to state the obvious, that negligent provision is a red flag. So what do you have to say about that? Yeah, understood. So I'd say two things. You know, first, as a matter of practice, I think it's rare for a simple, in fact, very unusual for simple negligence to give rise to criminal liability, that criminal prosecutions are brought only when there's some sort of serious aggravating conduct. And the other thing that I'd say is, you know, we think that standards like this, you know, it was reflected in the County of Maui where there was a similar multi-factor standard that also potentially gave rise to criminal liability. That didn't stop the Court from adopting that standard. We think the same should be true here. And we think if you really had a case where there was someone who was being criminally prosecuted and had a claim that the statute was vague as applied to them, that they didn't have fair notice, they could always bring an as-applied vagueness challenge in the criminal prosecution. Thank you. Justice Barrett? I want to return to Justice Sotomayor's point because I want to make sure that I understand exactly what the scope of your argument is. As you're arguing a case in this Court to win, we have to find that you're right about significant nexus. Justice Kennedy's position in Rapanos, because you're not really relying for purposes of this case on the 1344G adjacency language. Is that correct? We're relying on adjacency to the tributary, which requires us to make a showing of significant nexus. So we do have to have both as we brief the case. But I think also it's worth emphasizing that petitioners aren't challenging the significant nexus finding. And also I think they've conceded essentially that if you get past their idea that adjacent includes only things that directly touch, then their property is adjacent because it's only 30 feet away across the road. Okay. And then to follow up on Justice Alito's points about waters of the United States, if we put aside 1344G for a moment, and we're thinking about significant nexus. You know, Justice Thomas says he grew up in the low country of Georgia and I grew up in New Orleans. The whole thing's below sea level. So, you know, there are aquifers that run right underneath it. We have no basements because you dig far enough in anybody's yard, you hit water, and all that runs into Lake Pontchartrain and the Mississippi River navigable waters. So would that view of the Clean Water Act, the definitions of waters of the United States mean that anybody who constructed on a lot or built a backyard pool has to get a jurisdictional determination from the Corps before proceeding? No, I don't think so, Justice Barrett. Why not? Because these requirements all apply only if you're talking about wetlands, which has a particular scientific definition reflected in the regulations it requires. But your view of the statute wouldn't be so limited, would it? The statute, we think, is limited to wetlands. We don't argue that things that don't qualify as wetlands can be waters of the United States. Okay, and why would that be? Because of 1344G? Because nothing in the statutory definition of waters of the United States. I mean, if you're talking about something that has a significant nexus, presumably subservice water would. But we don't think that you could call groundwater a water of the United States. We don't argue that groundwater is covered. To Justice Sotomayor's point, we think that subsurface flow can be evidence of a connection between two bodies of water. But you have to be talking about waters. We think wetlands like swamps and marshes and fens like the one at issue here are waters of the United States or can be if they satisfy the test. And someone's backyard in New Orleans, if it doesn't meet the definition of a wetland, is not even potentially a water of the United States. But what about debris on the bank of the river, the example that you gave? So it's not on the river itself, but it's on dry land. I took that to be a question about the scope of Congress's constitutional authority. And I was giving that as an example of the Rivers and Harbors Act in order to protect the channels of interstate commerce, the aquatic channels of interstate commerce, extending its authority up onto land. We don't argue that Congress has done that here. Here it's about waters of the United States. So it hasn't used its full Congress clause authority in your view in the Clean Water Act. That's correct. Justice Jackson? Thank you, Counsel. Mr. Shipp? Whatever the deficiencies in the line drawing problem test, they pale in comparison to the significant nexus test. In response to Justice Thomas' question about the channels of commerce, the significant nexus test is far, far broader than a traditional understanding of the channels of commerce as shown by this very case. There's no evidence that anything that the Sacketts did affected any channel of commerce. It's the mere fact that they put gravel on their lot that now they're fully regulated under the Clean Water Act. And that raises Justice Alito's point about canons of construction and federalism. Building a single family home in a residential subdivision is the quintessence of local government authority, and yet the significant nexus test inevitably causes that to be regulated. JVs are expensive. There is an entire industry of environmental consultants whom one has to hire to fill out an adequate application to the core. Sure, the core doesn't charge you, but your consultant will definitely charge you an arm and a leg just to have a chance to find out whether one is in fact regulated. Counsel, can you just speak to the representation that was made about the Sacketts property in particular and the fact that prior to their purchasing it, there was some concern about the property being a wetland? Did I misunderstand that? I thought they went into it knowing that this might be a wetland. No, no. There was a jurisdictional determination done in 1996 by a prior owner. The Sacketts were not aware of that. They have been as a part of the purchase agreement. Shouldn't they have gathered information about the property prior to purchasing it? Justice Jackson, in the record, the Sacketts testimony is that there was no indication either from the county building department in their deed of title anywhere that this was a wetland. Moreover, even if they had been aware, that jurisdictional determination would have given them no comfort. Did they see the property? I understood in the pictures that you could tell that at least part of it was a wetland by looking at it. I believe Mr. Fletcher was referring to after the initial work had been done and the pictures show that there is water on the property, but that doesn't show how it was before. If I could go back, though, to the question of the jurisdiction. You keep talking about notice and fair notice and property owners not being able to tell or know about this issue. I'm just trying to clarify with respect to the Sacketts. There seems to have been a prior determination that the land was wetland before they bought it and whether or not they knew they could have known, I presume. So why is this unfair in this situation with respect to the government now asserting that authority? Justice Jackson, that determination had expired several years before the Sacketts even purchased the property. As Mr. Fletcher explained, typically jurisdictional determinations are only valid for five years. Moreover, that determination was done even before this Court's decision in Rapanos. So even if the Sacketts had been aware of it, it would have given them no notice whatsoever. We'll give you an extra minute for your rebuttal. Thank you, Mr. Chief Justice. The last point I'd like to make is with respect to compensatory mitigation, simply that obtaining a permit is a very expensive process. It's true that the Corps does not charge for permits, but the Corps will never give a permit unless one provides compensatory mitigation. And we cite studies from the amicus briefs at pages 20 and 21 of the yellow brief where the annual cost of compensatory mitigation under the Corps' program is in the billions of dollars. This is not an easy process. It's not a cheap process. And in terms of notice, it's not a fair process for property owners who have to deal with the significant nexus test, which is why this Court should definitively jettison that test. Thank you, Counsel. The case is submitted.